UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Jeffrey Beyst,

      Plaintiff,

v.                                  Case No. 07-10927

Pinnacle Airlines, Inc.,              Honorable Sean F. Cox

      Defendant.

_____/

**OPINION & ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jeffrey Beyst ("Beyst" or "Plaintiff") filed this action against his former

employer, Defendant Pinnacle Airlines, Inc. ("Pinnacle" or "Defendant"), alleging that Defendant

violated the Family Medical Leave Act ("FMLA") and discriminated against him on the basis of

his gender in violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"). The matter is

currently before the Court on Defendant's Motion for Summary Judgment. The issues have been

briefed by the parties and the Court heard oral argument on May 22, 2008. For the reasons

below, Defendant's motion shall be GRANTED.

BACKGROUND

Plaintiff filed this action against Defendant on March 2, 2007. Plaintiff's First Amended

Complaint asserts the following claims: "Violation of the FMLA" (Count I); and "Violation of

ELCRA" (Count II). Because Plaintiff has asserted an FMLA claim, this Court has federal

question jurisdiction over that claim and may exercise supplemental jurisdiction over his state-

law ELCRA claim.

Defendant filed its Motion for Summary Judgment on March 5, 2008. This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. The Statement shall include all necessary material facts that, if undisputed, would result in summary judgment for the movant.

> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

In compliance with this Court's practice guidelines, Defendant submitted a "Statement of Material Facts Not In Dispute" ("SMF") and Plaintiff submitted a "Counter-Statement of Disputed Facts" ("CSDF").

Plaintiff was initially hired by Defendant as a commissary supervisor in Defendant's Detroit Hub, where he supervised approximately five to fifteen employees. (SMF at ¶ 1; CSDF at ¶ 1). In 2001, he was promoted to Assistant Manager of Customer Service, where he supervised approximately 20 employees. (*Id*. at ¶ 2). He was later promoted to Hub Manager of Customer Service, where he was responsible for staffing, discipline and training employees. (*Id*. at ¶ 3).

Finally, in September 2005, Plaintiff became the Parts Foreman in the Maintenance Department at Detroit. (*Id*.). That was the position Plaintiff held when he was ultimately terminated by Defendant. (Beyst Dep. at 53).

As Parts Foreman, Plaintiff was responsible for running the materials shop, staffing, attendance, scheduling, monitoring training, overseeing inventory control and auditing. (SMF at ¶ 4; CSDF at ¶ 4). He supervised approximately eight employees in that position. (*Id*. at ¶ 5).

For the first month or two after assuming the Parts Foreman position, Plaintiff reported directly to Larry Grant ("Grant"), the Director of Material Management. (Beyst Dep. at 57). During his deposition, Plaintiff described his working relationship with Grant during those few months as "good." (*Id*.).

After that first month or two, Plaintiff's immediate supervisor was Jason Decker ("Decker"), who had been hired as the Parts Manager. (SMF at ¶ 8; CSDF at ¶ 8). Plaintiff described his working relationship with Decker as "good." (Beyst Dep. at 57).

Grant testified that Defendant requires its salaried employees to submit, in writing, their time off work for any reason, including time taken off for vacation, illness, FMLA leave, and jury duty. Salaried employees such as Plaintiff are to make that submission to their supervisors, either in an e-mail message or a hard copy document. (Grant Dep. at 107-08). The salaried employee's manager or supervisor then signs off and the time is submit it to payroll. Grant testified that while it is "basically an honor system for the salaried employees," they "still have the responsibility for their time reported." (*Id*.).

Salaried employees have also been sent reminders about submitting their time off. (*See* Ex. 6 to Def.'s Br.).

In June of 2006, Plaintiff was married to Julie Beyst. It was a second marriage for both Plaintiff and Julie Beyst and they had children from their previous marriages.

On Saturday, June 3, 2006, Julie Beyst gave birth to their son, Alexander. (SMF at ¶ 19;

CSDF at ¶ 19).  Plaintiff took two days off after the birth of his child; Monday and Tuesday (the 5th and 6th of June, 2006).  (SMF at ¶ 20; CSDF at ¶ 20).  On Monday, June 5, 2006, at 3:10 p.m., Plaintiff notified his supervisor, Decker, of the birth, stating "Just an FYI, my wife had the baby on sat.  I am not in the shop today [Monday] and will be out on Tuesday.  We have to visit the pediatrician.  I am going to try to get in on Wed since her family will be here with her."  (SMF at ¶ 21; CSDF at ¶ 21; Ex. 11 to Def.'s Br.).  Decker responded back, "Congrats man, Enjoy!!" (SMF at ¶ 1; CSDF at ¶ 1; Exhibit 11 to Def.'s Br.).  Decker did not object to Plaintiff taking Monday or Tuesday off.  (Beyst Dep. at 133).  Plaintiff returned to work on Wednesday, June 7, 2006.

On either June 24th or 28th of 2006, while Plaintiff was at work, Plaintiff's wife left the state with their infant son to go back to her parents' home in Kentucky.  (SMF at ¶¶ 28-29; CSDF at ¶¶ 28-29).  After Plaintiff's wife left him, Plaintiff continued seeing, on an individual basis, a therapist that he and his wife had previously seen together for family counseling, Joseph Walrad, PhD ("Walrad").  (Walrad Dep. at 12).

Plaintiff saw Walrad on June 29, 2006 for an individual visit.  (SMF at ¶ 30; CSDF at ¶ 30).  On his second visit, on July 7, 2006, Plaintiff filed out an Adult Personal History form, in which he indicated, among other things, that he was seeking help for "marriage trouble" and that he had no problems with respect to his job.  (Ex. 16 to Def.'s Br.).  Walrad's records indicate that he saw Plaintiff a total of 13 times between June 29, 2006, and September 5, 2006.  (SMF at ¶ 55; CSDF at ¶ 55).  Plaintiff testified that prior to his termination, Walrad had never discussed any diagnosis with him. (Beyst Dep. at 111).

Defendant's Human Resources representative Marva Steed ("Steed") testified that in

August, 2006, she received an anonymous call from an unidentified female who stated that Plaintiff was using his company credit card for personal use. (Steed Dep. at 50-56). She states that a week or two later, she received another complaint from a male, who she believed worked in the parts department, who stated that Plaintiff was not present at work when he needed to be. (Steed Dep. at ¶¶ 65 & 97).

In July or August, 2006, Defendant's accounting department approached Plaintiff concerning the fact that he had made some questionable charges on his company-sponsored credit card and was not paying his bill in a timely manner. (SMF at ¶ 70; CSDF at ¶ 70).

Plaintiff went to Memphis on August 31, 2006, to meet with Grant to discuss several issues. (SMF at ¶ 71; CSDF at ¶ 71).

On either August 31, 2006, or September 1, 2006, Plaintiff was given a Final Warning Letter from Grant, which Grant verbally went over with Plaintiff "step by step." (SMF at ¶ 72; CSDF at ¶ 72; Beyst Dep. at 163). The "Final Warning Letter," which is attached as Exhibit 23 to Def.'s Brief, addresses several issues concerning improper use of company credit cards and personal use of company shipping accounts. It also states:

> 5. Coinciding with recent personal issues your [sic] dealing with outside of work you took at least 56 hours of sick time in August. You told me that you didn't use that sick time for personal reasons, but you actually took the time off because you were really ill, and you said that you visited your physician during this sick time event. I expect you to provide me with a doctor's note in the next 5 business days validating that you visited your personal physician for your illness. This is a reasonable request for someone needing to take 7 business days off for an illness in a single pay period.

> Jeff, as I explained to you yesterday, these types of activities can be detrimental to your success at Pinnacle. As a result of your actions discussed above, I am giving you this letter of final warning. Any further infractions of company policies or procedures for the next twelve months will result in further discipline up to and

including termination.  If you fulfill all of your obligations stated above, and maintain a clean work record, this letter will be removed from your file after 12 months and no further action will be required.  If you need clarification for anything stated in this letter, please contact me immediately.

(Ex. 23 to Def.'s Br.).

Approximately a week later, on September 7, 2006, Plaintiff was called in to the office of Duane Henkins to have a conference call with Grant.  (Beyst Dep. at 181).  Grant testified that Human Resources had been investigating complaints about Plaintiff not being at work.  About one day before he terminated Plaintiff, Grant states that he obtained records from the investigation regarding security badge swipes of Plaintiff that show the times that Plaintiff entered and exited the airport property.  (Grant Dep. at 132-33; *see also* Exhibit 10 to Def.'s Brief).  Grant testified that it appeared from the records that Plaintiff had not been putting in full 40-hour work weeks over a period of three months.  (Grant Dep. at 269).  Both Grant and Plaintiff testified that, during the conversation on September 7, 2006, Grant asked Plaintiff about those records and why Plaintiff was not putting in 40-hour weeks.  When he did not receive an answer that he found satisfactory, Grant terminated Plaintiff for falsely reporting his time.  (Grant Dep. at 129-30).

After he had been terminated by Grant, on September 7, 2006, Plaintiff sent an e-mail to Grant that stated:

Larry, after taking time after our discussion regarding my absences from work I have determined that they are related to my mental status due to my family situation.  I believe that the time missed from worked [sic] will qualify as FMLA related missed time.  I would like to apply to FMLA immediately and believe that a termination was unjust due to these circumstances.  A letter was fed exed this morning from my mental health care provider, which has some corresponding dates, prior to our conversation this afternoon.  Please advise as to how this will be carried out.

(Ex. N to Pl.'s Br.).  Grant later responded via e-mail, "[i]n regard to FMLA you requested FMLA leave from me after you were told that your employment had been terminated.  As you were no longer employed with the company, you were not eligible for FMLA leave."  (Ex. O to Pl.'s Br.).

Plaintiff filed this action on June 12, 2007.

During discovery in this action, Plaintiff testified that as a manager at Defendant, he had received some limited training on the FMLA from Defendant.  (Beyst Dep. at 46-49).  He also testified that he never thought about taking FMLA leave at any time before he was terminated:

> Q.     Prior to your termination, did the thought that your situation might qualify for FMLA cross your mind?
>
> A.     I didn't even think about FMLA or leave at the time.  As far as – I mean, are you saying when I was missing work, it that --
>
> Q.     Prior – at any time prior to your termination, did you consider that any of your circumstances would qualify for FMLA leave or any type of leave?
>
> A.     No.  I more – I was told to use my sick time, that I had plenty of it.  And after that, my focus was on dealing with my situation.  And, you know, I didn't really – I wasn't in the mind set to sit and think and outline everything and say these are my options.  My focus was on taking care of my kids and the situation at hand.

(Beyst Dep. at 50).

Plaintiff testified that on at least two occasions, Steed and Grant asked him if he had "filed for a leave" and that Plaintiff told each of them that he had **not** requested any kind of leave.  (Beyst Dep. at 154-55, 179, 198).

During this action, Walrad was also deposed.  Walrad testified that Plaintiff first began seeing him in connection with family therapy:

> And then in June just after Julie had her baby, she left with the baby to Kentucky, and at that point Jeff was devastated by what had happened.  And at that point that became the issue because Julie was no longer willing to attend sessions.  We went

from family therapy to kind of individual treatment.

(Walrad Dep. at 12).  Walrad stated that "I think he was just devastated by what was going on in his life . . . I think he had just kind of fallen apart." (*Id*. at 13).

Walrad testified that his diagnosis of Plaintiff was "adjustment reaction with mixed features of anxiety and depression."  (Walrad Dep. at 18).  He testified that Plaintiff was "experiencing sleep problems.  He was always anxious.  He was clearly unsettled.  I think he was having difficulty concentrating."  (Walrad Dep. at 20).  Dr. Walrad's testimony also includes the following:

> Q.  During the time period from June of '06 to September of '06 when he was terminated, as far as you know, he was going to work and doing his job, is that correct?
> A.  Well, yeah, as far as I knew.  (Walrad Dep. at 28).
> . . . .
> Q.  But he never relayed to you any problems with his performance at work?
> A.  Not that I can recall.
> . . . .
>
> Q.  Did you come to a conclusion relative to Mr. Beyst's ability or impairment in terms of his social or occupational functioning?
> A.  I would say no, I mean in the sense that it wasn't a focus.  It wasn't like, you know – I mean I knew he was having difficulty, you know, because of all of this, and he was trying to juggle his work schedule with dealing with the crisis in his family . . .
>       . . . .
> Q.  Okay.  In terms of your observation of him and his demeanor in dealing with you, did you have concerns about whether, at least episodically, he would not be capable of working in his job?
> A.  I don't think that I did, no.
> . . . .
> Q.  Did you find that there was a significant impairment of his social or occupational or academic – I guess that doesn't really apply – functioning?
> A.  I don't think I could assess that because it was never really an issue.  I mean I knew that he – the sense I had was that he was still attending work and that that was still going for him.
>       So I didn't get the idea – although I knew that he was having difficulty

concentrating and that he was thinking about this all the time, it was my understanding that he was missing work more to visit his son and to try to resolve.  And then it got blended into all the legal proceedings where he had to go to court.

(Walrad Dep. at 28, 72, 86-87, 89-90).

ANALYSIS

I.      Plaintiff's FMLA Claims:

As explained in *Taylor v. Union Institute*, 30 Fed. Appx. 443, 452 (6th Cir. 2002), the FMLA creates prescriptive and proscriptive employee rights:

The prescriptive rights created by the Act provide "entitlements" to employees and "set floors for employer conduct."  To prevail on the basis of the Act's prescriptive rights, the plaintiff need not show that she was treated worse than other employees, just that she was denied the Act's entitlements.  Proscriptive rights, on the other hand, prohibit disparate employer conduct with regard to employees taking leave.

*Id.*  Thus, "[t]here are two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. §2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. §2615(a)(2)."  *Smith v. Aco, Inc.*, 368 F.Supp.2d 721, 731 (E.D. Mich. 2005). Here, Plaintiff asserts both an interference claim and a retaliation claim under the FMLA.

A.      Interference Claim:

With respect to his interference claim, Beyst alleges that he should have been given FMLA leave for his own serious health condition, and that he should have also been given FMLA leave to care for his newborn son.

To prevail on an interference claim, a plaintiff must establish that:  (1) he is an "eligible employee" under 29 U.S.C. § 2611(2); (2) the defendant is an "employer" under 29 U.S.C. §

2611(4); (3) the employee was entitled to leave under the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied the employee FMLA benefits to which he was entitled. *Cavin v. Honda of America Mfrg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).

Here, Pinnacle does not dispute that Beyst is an eligible employee under § 2611(2), nor does it dispute that it is an employer as that term is defined in § 2611(4). Thus, it is undisputed that Plaintiff can establish the first two elements.

Pinnacle claims, however, that Beyst cannot satisfy the third element (establishing that he was entitled to FMLA leave under § 2612(a)(1)) or the fourth element (establishing that he gave Pinnacle notice of his intention to take leave).

      1.    <u>Can Plaintiff Establish That He Was Entitled To FMLA Leave Under Section 2612(a)(1)?</u>

Section 2612(a)(1) provides, in pertinent part, as follows:

(1) Entitlement to leave
Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
    (A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.
    . . . .
    (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1).

      a.    <u>Leave To Care For Plaintiff's Child</u>:

With respect to leave taken for the birth of child or in order to care for that child, the FMLA provides that such leave "shall not be taken by an employee intermittently or on a reduced

leave schedule unless the employee and the employer of the employee agree otherwise." 29 U.S.C. § 2612(b)(1).

Pinnacle contends that Plaintiff's interference claim based on leave relating to childcare fails because: 1) it is undisputed that Plaintiff took leave, without any interference from Pinnacle, following the birth of his child, after which he returned to work; and 2) Plaintiff was not entitled to any additional or intermittent leave for child care.

It is undisputed that Beyst's wife gave birth to their child on Saturday, June 3, 2006. Beyst then took two days off work following his child's birth: Monday, June 5, 2006 and Tuesday, June 6, 2006. He then returned to work. Defendant contends there is no dispute that Plaintiff was allowed to take the requested days off and that Defendant did not interfere with Plaintiff taking those two requested days off.

Defendant contends that, to the extent that Plaintiff claims he was entitled to additional leave, or intermittent leave, under the FMLA to care for his child, that argument fails because: 1) the FMLA only provides for such intermittent leave if the employer agrees to provide intermittent leave; and 2) here, Defendant's Employee Handbook in effect at the time expressly provided that "Intermittent leave is not allowed after the birth and/or for the care or placement for adoption or foster care of a child." (Ex. 21 to Def.'s Br. at 29). Thus, it contends it never agreed to intermittent leave.

In response, Plaintiff takes the position that Defendant did agree to allow him to take intermittent FMLA leave to care for his son. The only evidence Plaintiff offers to show any such agreement, however, is that Decker approved Plaintiff taking time off to go to Kentucky to be with his son, etc., "stating words to the effect of 'your family comes first.'" (Pl.'s Resp. Br. at

12).

Defendant correctly notes that the FMLA only provides for intermittent FMLA leave after the birth or a son or daughter if the employer agrees to provide intermittent FMLA leave. Here, Defendant's policy clearly indicates that such intermittent leave is not allowed. (Ex. 21 to Def.'s Br. at 29). Moreover, there is no evidence before this Court to indicate that: 1) Plaintiff ever asked to take intermittent FMLA leave following returning to work after the two days he took off following his son's birth; or 2) any representative of Defendant agreed that Defendant would allow Plaintiff to take intermittent FMLA leave after the birth of his son.

While Decker did allow Plaintiff to miss work for incidents relating to Plaintiff's son, there is no evidence that Decker agreed that Plaintiff could take intermittent FMLA leave. Rather, when Plaintiff requested to take days off, neither Decker nor Plaintiff ever mentioned the FMLA, let alone agreed the time off would be intermittent FMLA leave. Rather, when Decker agreed to allow Plaintiff to miss work for incidents relating to his son, Decker told Plaintiff that he could use his "sick time" or "vacation time" and made no reference whatsoever to the FMLA. (*See e.g.*, Beyst's Affidavit at ¶¶ 19 & 23). There is simply no evidence that Decker, or anyone else at Defendant, agreed that Plaintiff could take intermittent FMLA-protected leave after the birth of his son.

Accordingly, the Court concludes that Defendant is entitled to summary judgment with respect to Plaintiff's interference claim relating to leave for childcare.

b.    Leave For Plaintiff's Own Serious Health Condition:

With respect to leave for Plaintiff's own serious health condition, Pinnacle contends that Plaintiff cannot establish that he was entitled to FMLA leave under § 2612(a)(1)) because he

cannot establish that he had a serious health condition that made him unable to perform the functions of his job.

Establishing a serious health condition under the FMLA requires that an employee have a condition that "makes the employee unable to perform the functions of the position of such employee." *Cavin, supra*, at 719 (citing 29 U.S.C. § 2612(a)(1)(D)).

Defendant notes that 29 C.F.R. §825.115 states that "An employee is 'unable to perform the functions of the position' where ***the health care provider*** finds that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the Americans with Disabilities Act (ADA)." (Emphasis in Def.'s Brief). Defendant contends that Plaintiff cannot establish that he had a serous health condition that made him unable to perform the functions of this job because Dr. Walrad did not reach any conclusions about Beyst's ability or impairment regarding occupational functioning.

Plaintiff responds in two ways: "First, Walrad's records and testimony do support the functional definitions of a serious health condition, contrary to Defendant's attempts to characterize the record. Second, any failure of Walrad to contemporaneously assess Beyst's ability to work was the direct result of the notice failures" of Defendant. (Def.'s Br. at 8).

Plaintiff responds that the Department of Labor Regulations detail the different ways in which conditions qualify as serious. He contends that the evidence shows he meets them because Dr. Walrad: 1) diagnosed him with adjustment disorder with anxiety and depression (Exhibit P to Pl.'s Br.) and 2) assessed Beyst's global functioning position as "58, midway between serious symptoms (suicidal ideation, etc.) and less serious symptoms (including moderate difficulty in occupational functioning)." (Def.'s Br. at 8-9).

Establishing a serious health condition under the FMLA requires that an employee have a condition that "makes the employee unable to perform the functions of the position of such employee." *Cavin, supra*, at 719 (citing 29 U.S.C. § 2612(a)(1)(D)).

The FMLA defines a "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves – (A) inpatient care in a hospital . . . or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

The Department of Labor's implementing regulations define continuing treatment, in pertinent part, as follows:

(a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury impairment, or physical or mental condition that involves:

(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(I) A period of incapacity (i.e., inability to work . . . due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider . . . or

(B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

. . . .

(iii) Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic health condition is one which:

(A) Requires periodic visits for treatment by a health care provider . . .

14

(B) Continues over an extended period of time (including recurring episodes of a single underlying condition) and

(C) May cause episodic rather than a continuing period of incapacity . . .

. . . .

(v) Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider . . . for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment . . .

29 C.F.R. § 825.114(a).

Here, it is undisputed that Plaintiff did not receive any inpatient care. Thus, the inquiry is whether he had a serious health condition involving continuing treatment by a health care provider. Plaintiff asserts that he may be able to satisfy "one or more" of the following subsections: 29 C.F.R. § 825.114(a)(2)(i),(iii) or (v). (*See* Def.'s Br. at 7-8).

Before the Court considers the "continuing treatment" prong of the definition of serious medical condition set forth in 29 C.F.R. § 825.114(a)(2)(I) or (iii), however, Plaintiff must first demonstrate that he suffered from a period of incapacity within the meaning of the regulation. *Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1164 (N.D. Ohio 1997). As explained in *Olsen,*

Under the plain language of the statute and regulations, this is the *threshold* consideration. Against, 29 C.F.R. § 825.114(a)(2) defines a 'serious health condition' as '[a]ny period of incapacity requiring absence from work . . . That *also* involves continuing treatment by (or under the supervision of) a health care provider.' (emphasis added). The interim regulations thus require a plaintiff to make a two-pronged showing of *both* an incapacity requiring absence from work *and* continuing treatment. Indeed, it is only where an incapacity is shown that the Court need proceed to a consideration of whether the employee received 'continuing treatment' within the meaning of the Act. Thus, construing the facts in a light most favorable to [plaintiff], if he fails to show that he had an illness or injury which incapacitated him for more than three days, the Court's inquiry is over and summary judgment is appropriate.

15

*Olsen*, 979 F.Supp. at 1164-65 (emphasis in original).  Thus, Plaintiff first has to establish that he was considered unable to perform his job before the Court need consider whether he received continuing treatment.

29 C.F.R. § 825.115 was issued to address the question, "What does it mean that 'the employee is unable to perform the functions of the position of the employee'?"  It states that "[a]n employee is 'unable to perform the functions of the position' *where the health care provider finds* that the employee is unable to work at all or is unable to perform any one of the essential functions of the employee's position within the meaning of the [ADA]."  *Id*. (emphasis added).

In order to show that he "was 'required' to miss work for more than three days, a plaintiff employee must show that he or she was prevented from working because of the injury or illness based on a medical provider's assessment of the claimed condition.  It does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work.  Rather, it means that a 'health care provider' has determined that, in his or her professional medical judgment, the employee cannot work (or could not have worked) because of the illness."  *Olsen*, 979 F.Supp. at 1166; *see also Whitaker v. Bosch Braking Sys*., 180 F.Supp.2d 922, 930-31 (W.D. Mich. 2001).

The *Olsen* court further explained that the "medical determination need not be made at any particular stage of the illness or at any particular point [post-illness.]  As long as the medical provider's assessment supports the professional assessment given, and that assessment is that an absence in excess of three days is necessary to proper treatment, a plaintiff employee should withstand summary judgment as to this particular prong of his or her required showing."  *Id*. at

n.11.

In sum, a plaintiff can establish that he was required to be absent from work only if he produces evidence showing that a health care provider has made a professional assessment of his condition and determined, at some point in time, based on that assessment, that a leave of absence from work was necessary. *Olsen*, supra at 1166.

Here, Plaintiff has failed to establish that Dr. Walrad, or any other healthcare provider, has ever assessed Plaintiff's condition as preventing him from working during the time period at issue. To the contrary, Dr. Walrad's testimony includes the following:

> Q.   During the time period from June of '06 to September of '06 when he was terminated, as far as you know, he was going to work and doing his job, is that correct?
> A.   Well, yeah, as far as I knew.  (Walrad Dep. at 28).
> . . . .
> Q.   But he never relayed to you any problems with his performance at work?
> A.   Not that I can recall.
> . . . .
>
> Q.   Did you come to a conclusion relative to Mr. Beyst's ability or impairment in terms of his social or occupational functioning?
> A.   I would say no, I mean in the sense that it wasn't a focus.  It wasn't like, you know – I mean I knew he was having difficulty, you know, because of all of this, and he was trying to juggle his work schedule with dealing with the crisis in his family . . .
>        . . . .
> Q.   Okay.  In terms of your observation of him and his demeanor in dealing with you, did you have concerns about whether, at least episodically, he would not be capable of working in his job?
> A.   I don't think that I did, no.
> . . . .
> Q.   Did you find that there was a significant impairment of his social or occupational or academic – I guess that doesn't really apply – functioning?
> A.   I don't think I could assess that because it was never really an issue.  I mean I knew that he – the sense I had was that he was still attending work and that that was still going for him.
>        So I didn't get the idea – although I knew that he was having difficulty

> concentrating and that he was thinking about this all the time, it was my understanding that he was missing work more to visit his son and to try to resolve. And then it got blended into all the legal proceedings where he had to go to court.

. . . .

(Walrad Dep. at 28, 72, 86-87, 89-90).

Even when construing the testimony in the light most favorable to Plaintiff, Walrad's testimony establishes that: 1) prior to Plaintiff's termination, Walrad never assessed Plaintiff's condition as preventing Plaintiff from working; and 2) Walrad does not believe that he is capable of making such an assessment even now. Thus, Plaintiff cannot satisfy 29 C.F.R. § 825.114(a)(2)(I) or (iii).

The Court further concludes that Plaintiff has failed to establish that he qualifies under 29 C.F.R. § 825.114(a)(2)(v), for a period of absence to receive multiple treatments by a healthcare provider "for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in absence of medical intervention or treatment" based on the following testimony by Dr. Walrad:

> Q. Let me rephrase that. If he had not gotten any treatment for anything after the fact, he might have been able to continue to work? You can't say with any reasonable degree of medical certainty that he would have been incapacitated by this?
>
> A. But I guess I would say yes, no, I couldn't say with any amount of certainty. That kind of confused me.
>
> Q. You are saying that you couldn't say – let me make sure I understand. You couldn't say with any degree – with a reasonable degree of certainty that, if he had not gotten treatment, he would have been incapacitated?
>
> A. Yeah, I don't know what would have happened, if that answers the question.

(Walrad Dep. at 109-111).

Accordingly, the Court shall grant summary judgment in favor of Defendant with respect

to this claim because Plaintiff cannot establish that he was entitled to FMLA leave under §
2612(a)(1)) because he cannot establish that he had a serious health condition that made him
unable to perform the functions of his job.

    B.    <u>Retaliation Claim:</u>

Plaintiff agrees that to establish a prima facie retaliation claim, Plaintiff must show that:
1) he was engaged in activity protected by the FMLA; 2) that his exercise of his protected rights
was known to the Defendant; 3) that Plaintiff thereafter suffered an adverse employment action;
and 4) that there was a causal connection between the protected activity and the adverse
employment action.  (Pl.'s Br. at 16).

Defendant states that Plaintiff never mentioned the FMLA during the entire time of his
employment, and never requested FMLA leave until after he was terminated.  Defendant
therefore contends that Plaintiff cannot establish that Defendant retaliated against Plaintiff for
exercising his FMLA rights when Defendant was unaware of his FMLA claim.

Defendant also contends that Plaintiff has failed to establish that he was entitled to any
FMLA leave other than the two days that he took off after the birth of his child and that the has
produced no evidence of a causal connection between that leave and his termination 3 months
later.

Plaintiff's response does not address how he believes he meets each of the essential
elements.  Rather, with respect to the first three elements, he simply states, "[i]n this case,
Beyst's request for time off were the protected activity.  At least Decker knew of the time off,
thereby placing Pinnacle on notice, Pinnacle fired Beyst."  (Pl.'s Br. at 16).

Based on what has been presented, the Court concludes that Plaintiff has not established a

prima facie case of retaliation.

First, it does not appear that Plaintiff was "engaged in any activity protected by the FMLA," other than the two days that he took off after his son's birth. As discussed above, the Court concludes that Plaintiff was not entitled to any FMLA leave for his own "serious health condition." Plaintiff asserts that *his requests for time off themselves* were the "protected activity." He has not offered any authority, however, to support that position.

In other words, it appears that Plaintiff may be arguing that even if he was not actually entitled to FMLA leave for a serious health condition, his request for such leave should still be considered "protected activity." This Court is not aware of any authority within this circuit on that narrow issue, but cases from outside this circuit have rejected similar arguments. *See, e.g., Walker v. Elmore County Bd. of Educ.*, 379 F.3d 1249, 1252-53 (11th Cir. 2004). In that case, the court noted that "[a]s a fallback position, [Plaintiff] asserts that the FMLA protects a request for FMLA leave regardless of whether the employee would be eligible for the leave." The court noted that "argument is based on the district court's holding that the FMLA" can protect someone who mistakenly asks for FMLA leave although they are ineligible for such leave. It disagreed with that position and held that the statute does not protect an attempt to exercise a right that is not provided under the FMLA.

Second, Plaintiff has not established that his exercise of FMLA rights was "known by Defendant." Although Plaintiff took time off work, he never referenced the FMLA with any of Defendant's representatives. Moreover, when Steed and Grant asked Plaintiff if he had filed for "a leave," Plaintiff expressly indicated to each of them that he had *not* sought any kind of leave. Plaintiff also admits that he never even thought about whether or not he could take FMLA leave

until after he was terminated. Given this evidence, the Court fails to see how Plaintiff can establish that Defendant was aware of Plaintiff's alleged exercise of his rights under the FMLA prior to his termination.

The Court shall therefore grant summary judgment with respect to Plaintiff's retaliation claim.

## II.     Plaintiff's ELCRA Claims:

Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex . . ." M.C.L. §37.2202(a).

Beyst's First Amended Complaint alleges that Defendant violated the ELCRA by discriminating against Plaintiff with respect to his gender. (Pl.'s First Am. Compl. at ¶ 44).

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on his discrimination claim. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007).

Direct evidence is evidence that is free of inferences and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). "It does not require the fact finder to draw any inferences to reach that conclusion. *Id*. Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.*

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Both

parties acknowledge that the *McDonnell Douglas* framework is applied to discrimination claims brought under the ELCRA and that Plaintiff bears the burden of establishing a prima facie case.

Once a plaintiff establishes such a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the Plaintiff's discharge. If the employer articulates such a reason, then the Plaintiff has the burden of showing that the articulated reason is in reality a pretext to mask discrimination. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001).

In its Motion, Pinnacle asserts that it is entitled to summary judgment on Beyst's ELCRA claim because he cannot produce any direct evidence of gender discrimination. It also contends that it is entitled to summary judgment because: 1) Beyst cannot establish a prima facie case of gender discrimination under the circumstantial evidence approach; and 2) even if he could, Pinnacle has articulated a legitimate, non-discriminatory reason for Beyst's termination and Beyst cannot establish that reason is a pretext for discrimination. Each ground will be discussed in turn.

A.     Can Plaintiff Produce Direct Evidence Of Discrimination?

Here, Beyst contends that direct evidence of gender discrimination exists. Beyst's affidavit states that during a conversation with Grant on August 9, 2006, Grant stated, "Let your wife take care of your kid. You have a shop to run." (Beyst Aff., attached to Pl.'s Resp. Br. as Ex. E, at ¶ 38). Beyst contends "[t]his evidence, in conjunction with the termination and the timing of the termination, is direct evidence of discrimination." (Pl.'s Resp. Br. at 19-20). Plaintiff relies exclusively on *Degrow v. Century Great Lakes*, 463 Mich. 534, 538 (2001).

As stated *supra*, direct evidence of discrimination is evidence that is free of inferences

and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.* For example, a facially discriminatory employment policy or a corporate decision maker's express statement to remove employees in the protected groups is direct evidence. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Direct evidence of discrimination was found to exist in *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000), where the university president allegedly said that "[w]e already have two black vice presidents. I can't bring in a black provost." Those comments were found to constitute direct evidence of discrimination because they required no inference to conclude that racial consideration motivated, at least in part, the employment decision at issue.

Direct evidence of discrimination was also found to exist in *Diaz v. City of Inkster*, 2006 WL 2192929 (E.D. Mich. 2006), where the plaintiff alleged that he was discriminated against on the basis of race. In that case, the plaintiff offered testimony that the City Manager had said that there were some "members on the council that wanted a black chief" and "when [the current police chief] retires, you can bet the next chief is going to be black." *Id.* at *9. The court concluded that the comments of that decision-maker constituted direct evidence because they expressed that race was a determining factor in the employment decision.

On the other hand, in *Blair*, a comment that the plaintiff employee was "too old to handle the Ford account" was not direct evidence that the plaintiff's termination was motivated by age discrimination. *Blair,* 505 F.2d at 524-25. The Sixth Circuit explained that

An inference is required to connect this statement to the decision to terminate

23

[plaintiff] (specifically, the inference that Henry Filters fired Blair for the same reason it removed him from the Ford account), so Tsolis's statement is not direct evidence that Henry Filters terminated Blair because of his age. This fact distinguishes Blair's case from *DeBrow v. Century 21 Great Lakes, Inc.,* 463 Mich. 534, 620 N.W.2d 836 (Mich. 2001), where the employer said that the employee was 'getting too old for this shit' during the conversation in which the employee was terminated. *Id*. at 838. Because the employer in *DeBrow* referred directly to the plaintiff's age as a reason *for his discharge*, no inference was necessary to connect that statement to the adverse-employment action.

*Blair*, 505 F.2d at 524-25.

The Court concludes that Plaintiff has failed to present direct evidence to support his claim that he was discharged, or suffered any other adverse employment action, due to his gender. The only "direct evidence" that Plaintiff contends exists is one ambiguous statement that he alleges that Grant made one month prior to his discharge. Plaintiff's affidavit states that in a conversation with Grant on August 9, 2006, during which Plaintiff told Grant that his wife had left the state with his newborn baby, that they were fighting over custody, and that he was missing work and getting counseling, Grant told Plaintiff "not to worry" but also stated "[l]et your wife take care of your kid. You have a shop to run." (Beyst Aff., attached to Pl.'s Resp. Br. as Ex. E, at ¶ 38).

In order for a plaintiff to make the requisite showing with direct evidence, he or she "must present credible, direct evidence of wrongful discrimination," which "cannot be based on rumors, conclusory allegations, or subjective beliefs." *Hein v. All America Plywood Co., Inc*., 232 F.3d 482 (6th Cir. 2000). "Nor can it be based on vague, ambiguous, or isolated remarks. *See Phelps v. Yale Sec., Inc*., 986 F.2d 1020 (6th Cir. 1993)(finding no prima facie case of age discrimination, even though the plaintiff's supervisor twice stated that the plaintiff was too old to continue at her prior secretarial position, because these were only isolated and ambiguous

comments).”

Here, although the sole, isolated comment that Beyst alleges Grant made a month before his discharge may support an inference that may favor Beyst's claim that he was terminated because of his gender, an inference would nevertheless be required. For the plaintiff to prove his case using direct evidence of discrimination, he cannot rely on the fact finder to draw *any inferences* to reach the conclusion that gender discrimination was the motivation behind his termination. *Nguyen,* 229 F.3d at 563; *Amini,* 440 F.3d at 359; *Blair*, 505 F.2d at 524-25.

Accordingly, the Court concludes that Beyst cannot meet his burden using direct evidence.

B.      <u>Can Plaintiff Establish A Prima Facie Case Of Gender Discrimination Under The Circumstantial Evidence Approach?</u>

In its motion, Pinnacle also contends that, if Beyst were to proceed under the circumstantial evidence approach, Beyst cannot establish a prima facie case. It also contends that even if Beyst could establish a prima facie case of gender discrimination, Pinnacle has articulated a legitimate, nondiscriminatory reason for Beyst's termination and Beyst cannot establish that reason is a pretext for discrimination.

In his response brief, Beyst fails to respond to these arguments. That is, Beyst's brief does not attempt to proceed under the circumstantial evidence approach and relies exclusively on purported direct evidence.

Accordingly, the Court shall grant summary judgment in favor of Pinnacle on Beyst's ELCRA claim.

CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's claims are dismissed with prejudice.

**IT IS SO ORDERED**.

Dated:  June 11, 2008                                    S/ Sean F. Cox
                                                          Sean F. Cox
                                                          United States District Court Judge

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing order was served upon counsel of record via the Court's ECF System and/or U. S. Mail on June 11, 2008.

                                          s/Jennifer Hernandez
                                          Case Manager to
                                          District Judge Sean F. Cox